So, because they actually have the time split here, let's go ahead and give five. And then if you want to reserve rebuttal time, you have your five minutes. You don't have to worry about creeping into the next counsel's time, which I know can be tough sometimes. I'm going to use my five minutes, and my co-counsel may or may not reserve some time. Okay, very well. You may proceed. May it please the Court, my name is Stephen Lowe, and I'm speaking today on behalf of the California Society of Entertainment Lawyers, otherwise known as CECL. CECL is an organization that's dedicated to protecting the rights of creative persons in the entertainment industry, such as the plaintiff in this case. CECL filed its amicus brief in this case to address what is a great injustice that occurred by the application by the lower court of the wrong test for substantial similarity. There are currently two mutually exclusive tests for substantial similarity that are being employed by the Ninth Circuit. One of them, the Selection and Arrangement Test, is actually mandated by the United States Supreme Court, which I'll get to more in a moment. The other one is the Filtration Test, and that was the test that was applied by the lower court in this case. Under the Filtration Test, the court looks at similarities in eight categories and then filters out those similarities which are not copyrightable. However, this effectively guarantees an unjust result. That's because, as the lower court pointed out, similarities in each one of these categories are generally not copyrightable as a matter of law. Now consider the fact that ideas are not copyrightable, that facts are not copyrightable, that scenes of fare are not copyrightable, the latter of which the court pretty much designated in its sole discretion. There is and has been simply no way for the plaintiff to win when the Filtration Test is applied. On the other hand, there is the actual law of the land, the Selection and Arrangement Test, which is not only mandated by the United States Supreme Court in the case of Feast Publications versus Rural Telephone Services, but has also been applied by the Ninth Circuit in many cases going back to 1947, including Universal Pictures versus Harold Lloyd, Roth Greeting Card versus United Card Company, Apple versus Microsoft, Three Boys Music versus Bolton, Metcalfe versus Bochco, Swirsky versus Carey, and in 2012, the L.A. Printex case. And in fact, in the L.A. Printex case, the court specifically relied upon the United States Supreme Court decision in Feist to find that original selection, coordination, and arrangement of unprotectable elements may be protectable expression. These tests are mutually exclusive, the Filtration Test and the Selection and Arrangement Test, because the Selection and Arrangement Test includes unprotectable elements and then looks at them in totality, while the Filtration Test excludes all unprotectable elements ab initio. It is crucial to note that there was no precondition to the application of the Selection and Arrangement Test in the aforementioned cases. It was applied without condition and was the only test applied. The court stated in Feist, the principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection. Originality requires only that the author make the selection and arrangement independently, i.e., without copying that selection or arrangement from another work, and that it displace a minimal level of creativity. When the Selection and Arrangement Test is applied, plaintiffs have a fighting chance against powerful defendants, as the plaintiff did in the Metcalf v. Bojko case. Unfortunately, the courts have distinguished Metcalf in two ways. The lower court in this case distinguished Metcalf by saying that there weren't enough similarities to apply Metcalf. But if you're applying the wrong test for similarity, how can you tell if the two works are similar enough? So clearly, that reason for distinguishing Metcalf is logically defective and circular. In Metcalf, the court pointed out eight similarities in plot, characters, and setting, defined that the totality of similarities goes beyond the necessities of the theme and belies any claim of literary accident. The cumulative weight of these similarities allows the Metcalfs to survive summary judgment. In the present case, there was even more qualitatively important similarities than those in Metcalf. There was over 25 in this case. They were by no means random, as they were connected by a pattern of elements relating to the unique theme of a walk of shame. And also, the court must only focus on similarities and not dissimilarities. As this court in Ninth Circuit stated in Shaw v. Limnheim, no plaintiff can excuse the wrong by showing how much of his work he did not pirate. In conclusion, the selection and arrangement test is the only test for copyright infringement mandated by the United States Supreme Court and therefore must be applied in this case. The court should remand or reverse based upon the selection and arrangement test. Happy to answer any questions, although I'm out of time. You're right on time. Well timed. Thank you. Nothing to be ashamed about. So you have ten minutes, counsel, and you may reserve if you wish, however you want to use your time. Good morning. May it please the court. My name is Charles Cote, and I represent the appellant, Shame on You, Productions, Inc. At the outset, it's well known in the area of substantial similarity in copyright matters that the analysis is a highly subjective analysis. What is at issue on this appeal is whether any future writer will ever be able to retain counsel to enforce their rights under copyright when they believe they've been infringed, because they will have to be told regardless of whether or not there's admitted access to a work, regardless of the existence of numerous similarities between a work, even a title. I suggest they'll be able to retain counsel if they're willing to pay for counsel. I mean, you're defining this in grand terms, but I'm not sure that really helps us with this case. Well, in grand terms in that they would be told we can't even file this case because it doesn't matter whether you have access, it doesn't matter if there are numerous similarities, it doesn't matter if they admit copying your work, and it doesn't matter if you have an extra. This is kind of a tale of woe argument, but, you know, at some point I'd like to hear about this particular case, because I really don't think that affirming would lead to a conclusion on the part of the bar that no copyright violation could ever occur again. I just don't see that. I'm more interested in the particularity of this case and how similar, I mean, the district court's decision is based on substantial similarity, and presumably you're arguing there is substantial similarity. I think that's probably more to the point. That is correct, Your Honor. The Ninth Circuit for decades has employed a two-part substantial similarity test, the extrinsic test and the intrinsic test, and the intrinsic test is to be determined by a jury. However, if the incorrect test is applied, as Mr. Lowe has indicated previously, you will never get to the intrinsic test, and the test is no longer a two-part test. This results in a violation of a plaintiff's constitutional rights to a jury trial in these infringement cases. The appeal standard in this case is de novo review, and therefore no deference need be accorded to the trial court's determination below. What preceded dismissal in this case under Rule 12 were Rule 12 motions to dismiss and motion for judgment on the pleadings made simultaneously. Therefore, the court was required to accept as true all facts properly alleged and to draw all reasonable inferences in plaintiff's favor. The record below evidences that the trial court failed to do that. For decades, the Ninth Circuit has enforced an inverse ratio rule in cases where there is access to a plaintiff's work, and under the inverse ratio rule. You're telling us a lot of law that we already know. We've read your briefs. Now, what is it? We're a court of errors. We don't make them. We correct them. What error did the trial judge make specifically that brings you to us? Your Honor, to the extent that access was conceded in this case by defendants for purposes of the motion and found plausible by the trial court, that substantially lowered the burden of substantial similarity showing that the plaintiff was required to make. There was access through the lead actress. There was access through the agency that represented both the actress and the writer-director. And there was access to the plaintiff's work. You already told us access was conceded, so telling us that there was access really, I mean, we're now nearly two-thirds of your time, and we're still kind of waiting to get to the substance of the case. Well, Your Honor, to the extent that that access was very high,  the trial judge's opinion, extensive, thorough opinion, I thought, addressed that question of the inverse rule and didn't say that, oh, this lowers the burden substantially or by some great margin. On the contrary, the trial judge recognized that there's some question about how that rule works and acknowledged the existence of the rule because there was factual evidence of access, but didn't make a big issue of it. What's your issue? Well, the fact that she didn't make a big issue of it and didn't, although she paid lip service to it, she didn't properly apply it. She specifically found articulable similarities in the tow yard scene and the helicopter scene. Defense themselves conceded particular similarities in the title, the basic ideas of the work, and in the premise of the work. She went all through that. Pick one. You've raised a huge array of issues and concerns with this trial judge's opinion. What's your best case? The best case, Your Honor, is that under Metcalf, which applied in this case, unless it's to be overturned, she cataloged over 30 similarities in her order, but then she went and rejected all of them as scenes of fair stock story devices. But the fact is this motion picture and our client's screenplay were the first walk of shame comedy that had been done. It hadn't been done before, so therefore to say that all of these plot devices were scenes of fair, scenes of fair follow from a horror genre, something that people have seen before time and time again. There is no walk of shame comedy that preceded this, and my client's predecessor in interest wrote the screenplay five years before they supposedly wrote theirs and incorporated all of these similarities. Is it your argument that the notion of a walk of shame on the part of a young woman who wakes up in the morning and discovers she's not where she thought she should be and wanders wherever she goes to go home, is it your notion that that had never been thought of before or heard about? Your Honor, I'm not saying that it's never been thought of or heard of before, but clearly. Do you remember your college days, counsel? I certainly do. But we would say that it has become a meme, if you will, in relatively recent history. Urban Dictionary I just looked up says walk of shame. It's got a citation here to 2004. That's well before your client's screenplay. I mean, it doesn't strike me as a particularly new or novel concept. Three years, Your Honor? That's not that much time. 2004? Well, three years of time. That's not that. It hadn't been done before. And the point that we would make and we made below was what made it unique. It's commonly associated with college students. This was done with an older woman, a professional woman, who the theme was should have known better. Well, let me ask you this, counsel. I mean, one response to your case is, look, no offense to people who work in this industry, and I mean it to both sides here. All these movies are the same, right? It's a fish out of water. It's a young woman who finds herself about love and what am I going to do? And I'm getting older and I have my career. I can't tell you how many of these movies my wife has made me see in the past 20 years. You're going to regret that. No, trust me. I complain about it all the time. Why is this case different than me just having that reaction to it? I want to get back to the judge's question here. What makes this case different than that they're all like this? Well, first of all, it was not a stock comedy, and it was a comedy with a premise that had not been done before. It wasn't historical fiction. Those cases, like in the Binet case, are extremely difficult because they're premised upon historical facts, and, of course, facts can't be copywritten. But when you look at the sheer volume, it belies coincidence. And for the district court to say, I'm an expert, I can do this at a Rule 12 stage, she clearly was not equipped to do it. There were numerous things, in her opinion, that are not in the film itself. And to premise her decision upon extrinsic evidence offered by defense counsel through a declaration, we didn't sue on his full blue shooting script. We hadn't seen it. We sued on the film, and we had specific time code sequences. She made reference to things that weren't in the film and compared things that were not in the film that were in their screenplay. So clearly the judge premised her decision upon improper extrinsic evidence that was not sued upon, that was not the subject of the infringement, and compounded it by saying, I'm only going to do it unilaterally. I'm not going to consider your expert report that's unrebutted from a screenwriting professor at the University of Texas who obviously was well qualified to make that analysis. That's a very fair point, counsel, and I plan to take that up with the other side when they get up here. Why don't we do this, counsel? I'll give you two minutes for rebuttal. Thank you. And you'll sit down now and come on up. And why don't we start with your question? Why don't you start, Judge Plager, with your question? No. No, no. Let's give him a start. We always allow him 30 seconds. Right. Just understand the question is lurking. There are quite a few things that I could say about the law, the history, and what substantial similarity means, but I'm going to go straight to the facts because the facts in this case hit you in the head. What a refreshing idea. What facts are you wanting to go to? Page one of the plaintiff's screenplay, it took us seven months to get it, but when we started reading it, it took seven seconds to read that the lead actress is wearing a horribly ugly, puffy-pink, pastry, one-shoulder, Southern Belle-style bridesmaid dress. And that, that ugly, pink, puffy, Southern-style dress is the center of her attire for the entire film. And our film has Elizabeth Banks in a skin-tight, yellow cocktail dress. Quite yellow, yes. And yet, despite the fact that there is no person, no jury, no court, no one that I could ever conceive of, that would conclude that the ugly, pink, Southern, puffy dress has any similarity. But they both end up in the same junkyard trying to get the car for which they realize they have no identification and no keys because they're probably back in whoever's house they don't even remember the name of that they left early in the morning. That's a similarity of some significance. My point, Your Honor, is that this is a case that was pled and argued not on the actual facts, not on the contents of the screenplay, but on counsel's characterization. Counsel characterized those two dresses as being substantially similar in their list of similarities. And when you look at that, you should immediately understand that nothing in counsel's complaint or characterization can be trusted. So let's go to the similarities that we have. Let's go to the junkyard. Let's not get into personal criticism of the other side. I'm just looking at the cocktail restaurant. It's not helpful, counsel. Move on. All right. As the district court correctly noted, these two stories share a top-level idea, a concept. A young woman goes home from a bar, wakes up in somebody else's place without her keys, her car, or her wallet, and has to get someplace. Hijinks ensue. If we had to write the idea of this film on a three-by-five card in three sentences or less, that would basically be it. If we put that idea up on the wall and we concede that there can be no infringement, no similarity based on idea, there's almost nothing left here. A young woman in Los Angeles. One problem left, counsel, and the problem is this. The trial judge compared the plaintiff's scripts with your script, right? Did more. She compared it also with the movie. There were two points of comparison. Much of her opinion is written as a comparison to your script, which wasn't in evidence. There's a problem with that, isn't there? The concept of in evidence in the context of a 12B motion is a little unclear here. It depends on what is is? Is that what you're telling us? It's a question of what the court is doing on a 12B motion. On a 12B motion, the court is looking at what the plaintiff has pled. And the plaintiff had pled that the motion picture and its screenplay borrowed from the plaintiff's screenplay. Now, at the time that we filed our motion, the question of whether or not the plaintiff was going to run to the screenplay as its evidence of infringement or run to the movie as evidence of infringement was unclear. The plaintiff amended its pleading while the motion was pending because the motion was pending for over six months in the district court. The district court looked at both of those things and said there's no substantial similarity here. The plaintiff had two opportunities, two wells from which to find similarity, and it failed both. It went 0 for 2. It now strangely complains that there was too much opportunity to find similarity on this record. It states in its brief in front of this court that the screenplay for the motion picture is irrelevant because there was no claim of infringement. That was not immediately clear when it filed its original complaint, but we take it at its word now. The question of whether there was similarity or lack of similarity on the screenplay is thus moved. It's removed. They have withdrawn even the charge of infringement as to the screenplay. The district court did not find any similarity on the motion picture. The district court had the motion picture properly in front of it. The district court examined the motion picture, and the order indicates that it examined the motion picture and found that there was no similarity. The motion picture is before this court on de novo review. If Your Honor, having seen this distinguished picture, finds in it some aspect of similarity, then I welcome a discussion. I confess I haven't seen the picture yet, but I saw Rotten Tomatoes gave it a 12, so I'm not really chopping at the bit. It seemed like a good idea at the time, I'm sure. We all live in a world in which everyone thinks that their movie was a good idea at the time, I think. I concede that it is not Avatar, and yet my point is, Your Honor, that the record is before us as it was before Judge Morrow, and there is nothing in this record that shows an ability of the plaintiff to demonstrate substantial similarity, as is required with respect to the protectable expression in its work versus the movie. What's your response to the amicus argument that the judge never addressed the correct standard for judging this case? I believe that the amicus, with all due respect, simply misstates the standard for infringement. The amicus cites to the Feist decision of the Supreme Court for a supposed separate test with respect to substantial similarity, and that's not what Feist is about at all. Feist uses its reference to arrangement in an analysis of what is eligible for copyright protection, what may be protectable. Feist, for the sake of familiarity, is about a telephone book in which the individual entries are names, addresses, and phone numbers. And so the issue in Feist is whether or not the plaintiff's collection of those names, addresses, and telephone numbers was sufficiently original to qualify for protection, whether you could get out of box one in the analysis. Feist does not purport to analyze what is the test for substantial similarity once we have got a work which can claim protection. And the law in this circuit is 100 percent clear that that test is a comparison for substantial similarity focused only on the protectable elements between the plaintiff's work and what is in the defendant's work. We know from Section 102 and decades of case law that ideas and concepts are excluded. They are not protectable. We know from Binet and dozens of cases that stock scenes that flow from the idea. If a woman in Los Angeles is far from home and does not have her car and must get someplace, it is not at all surprising that your movie will have a taxi in it. It is not at all surprising when somebody has had their car towed that they will go find it. It is not at all surprising that a helicopter will show up from God and lift them off. They both have helicopters. They absolutely both have helicopters. I would invite a comparison on a scale of the movies that the Court has found over the course of the years not to be substantially similar as a matter of law. The Binet case involves The Last Samurai, and in that case you have two motion pictures with the exact same title set in the exact same place with a virtually identical protagonist doing a virtually identical thing. They have scenes, Your Honor, in which the protagonist meets the Emperor of Japan, the same emperor at the same time for the same purpose. This Court held not substantially similar as a matter of law. In funky films, you have a screenplay and then a television production, six feet under, both set in a funeral home with a family where the original founder dies and the brothers come, take over the business, and there is conflict between them. Same setting, same theme, a number of assembled similarities. This Court again holds that there is no similarity as a matter of law. I submit that this case factually is well further afield than Binet or funky films, that there is virtually nothing here than a random pick of a couple of pieces, a couple of elements, a helicopter, a taxi, a sign. If we examine what the circuit has done, and indeed if we examine what any circuit has done with respect to how much you have to show in order to create substantial similarity, it is... What would we find? We would find that you cannot just cherry pick a piece here and a piece here, that the components of the extrinsic test, the plot, the theme, the characters, the dialogue, are never intended to be a checklist, a scorecard in which we just check boxes and add them up. They are intended to be a disciplined, objective method of determining whether the assembled story is substantially the same. Here you have two films set in completely different places in which completely different scenes occur, in which the theme, the plot, the resolution are different. You would not look at Walk of Shame and ever think that it is the same as Darcy's. And therein lies a gulf of difference. Metcalfe, which is relied upon both by the amicus and by the appellant, is different for the simple reason that in Metcalfe the court explicitly found exactly those identities that were absent in Binet and absent in Funke and are absent here. In Metcalfe, the court finds that the two works are set in the exact same place, County Hospital in Los Angeles. They have virtually identical characters. They have virtually identical plot points. And the court specifically relies upon that as part of its conclusion when it says that the similarities between the relative works are striking, cataloging them all in a long paragraph, and goes on to say, the totality of the similarities goes beyond the necessities of the theme and belies any claim of literary accident. Metcalfe relied upon a sequenced and intricate factual identity between the two works that was not present in Binet, not present in Funke, and not even close to present here. Amicus's brief contains a lengthy footnote and the suggestion that it is this critical application of substantial similarity law that has screened out all of these cases for copyright infringement in the Ninth Circuit. I submit to you that if you examine those cases, and I suggest the two Avatar cases because James Cameron should be sued not once but twice for copying Avatar. If you look at those cases factually, what you see is not a court engaged in an overly aggressive filtration test. What you see is a great number of people who are confused about what copyright is supposed to protect. There is a theme here, and it is a theme of people who believe that their idea, their concept is worthy of protection under copyright, and they're just wrong. Under copyright, ideas are free, and they cannot be the basis for a claim of infringement. Thank you. Thank you, counsel. We'll have two minutes of rebuttal. At the outset, opposing counsel said they couldn't understand whether or not we were suing on their screenplay or on the film, but all you have to do is read the four corners of the complaint. Clearly, the claim was based on the film, and therefore the time codes were referenced. The upshot is we can't waive that which we never asserted in the first place. The stage in which the trial judge made this determination and the manner in which he did it in unilaterally considering extrinsic evidence to the exclusion of expert testimony offered by plaintiff, one through a screenwriting professor at the University of Texas whose career before that had been working at a major studio doing coverage, and the other a well-known producer, both of those expert opinions cataloged what they believed were substantial similarities in the work and that those similarities were not the result of coincidence. If you go to Metcalf, and to the extent that Mr. Mick said the trial court applied it, the fact is in her lengthy tentative order that she handed out a few minutes before the hearing, Metcalf isn't really mentioned. It was only after we argued it at the hearing that three weeks later there was a minor analysis of it after the fact. Her opinion goes into Metcalf at some length. But only after the hearing, Your Honor. We're not reviewing the hearing, counsel. I'm not even sure we're reviewing the opinion. We don't judge opinions. We judge judgments. So I'm not even sure we need to get into that debate, other than the trial judge was obviously quite aware of Metcalf and its implication for her case. Let me ask you a question on that point. Do you agree with the amicus that the filtration test and the selection and arrangement test are mutually exclusive and the Ninth Circuit should go one way or the other but can't go both? Yes, because if you look at Metcalf, and the Ninth Circuit has said in cases of access Metcalf applies, Metcalf says, look, we can look at non-protectable expression. We can look at ideas. We can look at stock story devices. We can look at scenes of fare. We can look at those things that in and of themselves might not be individually protectable. But if there's so many of them, that pattern in and of itself may constitute protectable expression. And that's what you have here. Why is that inconsistent with the basic what they call the filtration test as well? Because you can't do an analysis of the overall pattern if you throw everything out before you start the analysis. This court only talked about two articulable similarities. Now, are they because of coincidence? I don't think anybody on this panel thinks that those are coincidental. So if you throw everything out before you do the analysis, you can never accurately gauge whether or not there is a pattern overlooking all of it. And the last point I would make is to reject expert testimony in this case. When the Ninth Circuit routinely considers expert opinion on music cases and in fabric cases, and you're talking in music cases about snippets of songs that are two, three seconds in length, but yet this court says, hey, under this Christensen case where the court said a map of the U.S. was in the public domain, that gives me grounds to do this on a Rule 12 motion without considering expert testimony on an audiovisual work that can be two, three hours in length. It makes no sense. All right. Thank you very much, counsel. We have your argument today. Thank you. This matter is submitted. There's one more case on calendar which is also submitted, National Conference of Personnel Managers v. Governor Brown. And with that, thank you, counsel, for your argument today. And we are in recess until 8.30 tomorrow morning. 8.30. Thank you. All rise.
judges: Clifton, Owens, Plager